Filed 5/24/23  Physicians for Social Responsibility Los Angeles v. Dept. of Toxic Substances Control CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| PHYSICIANS FOR SOCIAL RESPONSIBILITY - LOS ANGELES et al., | C088821 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34-2013-80001589-CU-WM-GDS) |
| v. | |
| DEPARTMENT OF TOXIC SUBSTANCES CONTROL et al., | ORDER MODIFYING OPINION AND DENYING REHEARING |
| Defendants and Respondents; | [NO CHANGE IN JUDGMENT] |
| THE BOEING COMPANY, | |
| Real Party in Interest and Respondent. | |

THE COURT:

It is ordered that the nonpublished opinion filed herein on May 2, 2023, be modified as follows:

1.  On page 6, in the third sentence of the third paragraph, the words "calls for an environmental impact report (EIR) from DOE, requires" are deleted and replaced with "cooperation in providing all available information necessary to facilitate DTSC's preparation of an environmental impact report (EIR)," so the sentence reads:

1

DOE's obligations under the 2010 AOC include cleanup of both chemical and radiological contamination pursuant to both the HWCL and HSAA, cooperation in providing all available information necessary to facilitate DTSC's preparation of an environmental impact report (EIR), the remediation of soils (including structures and debris) to local background levels and disposal of all materials with radiation above background levels to be disposed of in a licensed radioactive waste facility.

2. On page 45, in the partial paragraph, the second to last sentence "In fact, it appears Boeing sought to use criteria more restrictive than the federal standards when it chose to remediate exposure levels comparable to background levels" is deleted.

3. On page 49, the paragraph beginning at the top of the page with "As a final note" and ending with "the decommissioning process regarding other licensees" is deleted.

There is no change in the judgment.

Appellants' petition for rehearing is denied.

BY THE COURT:


_____/s/_____
DUARTE, Acting P. J.


_____/s/_____
EARL, J.


_____/s/_____
MESIWALA, J.

2

Filed 5/2/23  Physicians for Social Responsibility Los Angeles v. Dept. of Toxic Substances Control CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| PHYSICIANS FOR SOCIAL RESPONSIBILITY - LOS ANGELES et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> DEPARTMENT OF TOXIC SUBSTANCES CONTROL et al., <br><br> Defendants and Respondents; <br><br> THE BOEING COMPANY, <br><br> Real Party in Interest and Respondent. | C088821 <br><br> (Super. Ct. No. 34-2013-80001589-CU-WM-GDS) |

After decades of use as a chemical and nuclear research and testing site for federal defense and space programs, additional decades have been spent working to clean up an area known as the Santa Susana Field Laboratory.  The Boeing Company owns much of the land comprising the field laboratory and intends to demolish its own buildings located in a section of land previously used for nuclear research.  Concerned that the buildings to be demolished are contaminated with carcinogenic radionuclides, and improper disposal

1

of contaminated debris would have significant and troubling environmental and public health risks, plaintiffs sued respondents, accusing them of, inter alia, abdicating their duties to protect the public from these hazards by failing to analyze the environmental consequences of the demolition as required in the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.), deviating from the regulatory standard for eliminating radiation, and hiding their treatment of this dangerous waste from the public. The superior court denied plaintiffs' petition for writ of mandate, primarily on the basis that The Boeing Company's demolition activities did not constitute a project for CEQA purposes. Plaintiffs appeal that decision, arguing that the public agencies' actions in approving, controlling, and directing The Boeing Company's predemolition activities resulted in the issuance of an "entitlement for use" and/or direct action toward the demolition project and therefore qualified as a project under CEQA. Plaintiffs also argue that respondents improperly attempted to avoid CEQA by segmenting the project. Finally, they accuse respondents of violating a prior writ of mandate regarding setting the standards for radiological remediation and promulgating underground regulations. We affirm.

## FACTUAL BACKGROUND

### I

### *Activity at Santa Susana Field Laboratory*

Since the start of the nuclear age, the federal government made and tested liquid-rocket engines, nuclear reactors, and various nuclear applications at the Santa Susana Field Laboratory (SSFL). When built in southeastern Ventura County in the 1940s, this lab was in a remote area. It is fair to say that this area is no longer considered remote. (*Boeing Co. v. Movassaghi* (9th Cir. 2014) 768 F.3d 832, 834 (*Movassaghi*).)[1] It would

---

[1] The unique use of the land over a long period of time prompted litigation over the years, especially relating to remediation efforts. As one example, *Movassaghi, supra,*

2

also be an understatement to say that this site, while no longer involved in active research, has been subjected to contamination by nuclear and chemical toxins, sometimes with abandon.[2]

The National Aeronautics and Space Administration (NASA) owned roughly 16 percent of the 2,850-acre lab site and The Boeing Company (Boeing), or its predecessor Rockwell International Corporation, owned the remainder. (*Movassaghi, supra*, 768 F.3d at pp. 834-835.) Since the 1950s, the federal Department of Energy (DOE) and its predecessor agencies have leased 90 acres of the site, known as Area IV, from Boeing, where it built and operated several nuclear reactors and other facilities for nuclear research. (*Id.* at p. 835.)

NASA and DOE hired Boeing to assist in nuclear research and rocket testing within Area IV. Most of Boeing's work was as a contractor on behalf of the federal government, though Boeing also operated one commercial nuclear reactor under a license from the Atomic Energy Commission. Boeing also handled radiological contaminants under licenses from the State of California to perform certain activities related to research. As a result of the work performed on behalf of the federal government, the soil, groundwater, and bedrock were seriously contaminated.[3] (*Movassaghi, supra*, 768 F.3d at p. 835.)

---

768 F.3d 832 involved the constitutionality of a state law governing cleanup standards at this site. This case is referenced by the parties as providing relevant history of the site. We also rely on *Movassaghi* to provide useful historical background as to the site and the relationship between the parties.

[2] (See, e.g., *Movassaghi, supra*, 768 F.3d at p. 835 [noting disposal methods included dumping radioactive material at various locations around the site and "shooting barrels of toxic substances with shotguns to make them explode and burn"].)

[3] As stated in *Movassaghi, supra*, 768 F.3d at page 838, the parties appear to have agreed that remediating the groundwater " 'could take as long as 50,000 years.' " In addition, the federal court found that the "federal government, not Boeing, appears from the record to be responsible for the radioactive pollution. Though Boeing conducted

DOE ended its nuclear research at SSFL in the 1980s and closed its research center in 1996.  NASA's rocket research ended in 2006.  As part of the process of halting research, six previously licensed buildings in Area IV were ultimately decommissioned by the State Department of Public Health (DPH) and its predecessors.  (*Movassaghi, supra*, 768 F.3d at p. 836.)  It was Boeing's notification of intent to demolish several of its buildings within Area IV that spawned this lawsuit.

II

*Remediation Oversight at SSFL*

SSFL is currently undergoing cleanup efforts.  Different aspects of the cleanup are being carried out under different federal and state authorities.  The federal government, through the DOE, is responsible for supervising and implementing the cleanup of radioactive contamination.  California's Department of Toxic Substances Control (DTSC) is the lead agency responsible for regulating the cleanup of chemical contamination.[4]  (See *Movassaghi, supra*, 768 F.3d at p. 836.)

A.  DOE

Nonradioactive chemical pollutants are regulated differently from radioactive pollutants.  DOE is responsible for remediating radioactive contamination.  Remediation of radioactive materials is proceeding, in part, pursuant to an environmental assessment and plan adopted by DOE.  (See *Movassaghi, supra*, 768 F.3d at pp. 836-837.)

---

some commercial nuclear work at the site, no radioactive contamination has been traced to Boeing's private activity."  (*Id*. at p. 835.)

[4]  In 2007, the California Legislature attempted to change the standards governing the cleanup of radioactive contamination at SSFL when it passed Senate Bill No. 990 (2007-2008 Reg. Sess.) (Stats. 2007, ch. 729).  Senate Bill No. 990 attempted to establish more stringent standards than federal law and DOE's procedures set.  (Health & Saf. Code, § 25359.20.)  Boeing brought a legal challenge to Senate Bill No. 990 that resulted in the Ninth Circuit holding Senate Bill No. 990 unconstitutional as violating the Supremacy Clause.  (See *Movassaghi, supra*, 768 F.3d at pp. 840-842.)

4

*B. DTSC*

DTSC regulates hazardous waste under both federal and state law. The federal law, the Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.) (RCRA), "governs the handling of solid wastes, both hazardous and nonhazardous." (*Ashoff v. City of Ukiah* (9th Cir. 1997) 130 F.3d 409, 410.) The RCRA "provides a mechanism by which the states can administer their own hazardous waste programs 'in lieu of the Federal program.' [Citation.]" (*State of Washington v. EPA* (9th Cir. 1985) 752 F.2d 1465, 1466.) California's hazardous waste program, which the United States Environmental Protection Agency (US EPA) authorized in lieu of the federal program, is contained in the Hazardous Waste Control Law (Health & Saf. Code, § 25100 et seq.) (HWCL), and accompanying regulations (Cal. Code Regs., tit. 22, § 66260.10 et seq.). (See also 42 U.S.C. § 6926(b); Health & Saf. Code, § 25159.)[5]

Through the HWCL and California's Carpenter-Presley-Tanner Hazardous Substance Account Act (Health & Saf. Code, § 25300 et seq.) (HSAA), DTSC regulates soil and groundwater cleanup. The HWCL governs handling, transport, storage and disposal of "hazardous waste" but does not apply to certain radioactive materials regulated under federal law. (See Health & Saf. Code, §§ 25140 et seq., 25150 et seq., 25160 et seq., 25167.1 et seq.; Cal. Code Regs., tit. 22, § 66261.4, subd. (a)(2).) The HSAA governs cleanup of "hazardous substance" release sites, which includes certain radionuclides. (Health & Saf. Code, §§ 25356, subd. (a)(1), 25356.1.3, subd. (a), 25316; 40 C.F.R. § 302.4.) DTSC represents it has not issued an order to, or entered into any agreement with, Boeing under the HSAA.

---

[5] Both the RCRA and HWCL govern chemical contamination and exclude radioactive materials regulated under the federal Atomic Energy Act. (42 U.S.C. §§6903(5), (27), 6905(a); Cal. Code Regs., tit. 22, § 66261.4, subd. (a)(2).)

In addition to its overall regulatory authority pursuant to statute, DTSC oversees the chemical remediation of SSFL pursuant to two consent orders: the 2007 consent order for corrective action (2007 Order), and the 2010 administrative order on consent for remedial action (2010 AOC).[6]

The 2007 Order was entered into between DTSC, Boeing, DOE and NASA, pursuant to the HWCL. The 2007 Order applies to all of SSFL and identifies structures in Area IV (none at issue in the instant matter) that require further chemical investigation and remediation, but it has no provisions governing the cleanup of radiological contamination and excludes radioactive wastes, noting those are evaluated by DOE under a different program. The 2007 Order contemplates the process of remediation of chemical contamination in the soil and groundwater and acknowledges that work performed under the order is subject to CEQA. (See *Boeing Co. v. Robinson* (C.D.Cal. Apr. 26, 2011, No. CV 10-4839-JFW (MANx)) 2011 WL 1748312, at *5.) Significant to our review, the 2007 Order does not obligate Boeing to demolish any of its buildings in Area IV.

The 2010 AOC, entered into by DTSC and DOE (not Boeing), applies to Area IV and an area not relevant to this case known as the Northern Buffer Zone. The order itself describes its purpose as "to further define and make more specific DOE's obligations with respect to only the cleanup of soils at the Site." DOE's obligations under the 2010 AOC include cleanup of both chemical and radiological contamination pursuant to both the HWCL and HSAA, calls for an environmental impact report (EIR) from DOE, requires the remediation of soils (including structures and debris) to local background

---

[6] In 2010, at DTSC's request, Boeing prepared standard operating procedures (SOP) that would govern its demolition activities at SSFL. The SOP was amended twice: Amendment 1 addresses demolition of nonradiological buildings in Area IV and Amendment 2 specifically addresses former radiological buildings in Area IV.

levels and disposal of all materials with radiation above background levels to be disposed of in a licensed radioactive waste facility. The 2010 AOC requires DOE to obtain DTSC's review and approval of the demolition and disposal plans for buildings owned by DOE. The 2010 AOC also charged DOE with trying to obtain Boeing's cooperation with the removal of buildings owned by Boeing and clarified the obligations of DOE regarding the cleanup of soils if and when Boeing chose to demolish the buildings in Area IV. Specifically, the 2010 AOC dictates: "To the extent DOE is unable to remove, or arrange with Boeing to remove, the buildings at the Site that remain under the ownership and control of Boeing, DOE's obligations under this Order related to soils beneath those buildings shall be stayed, and DOE shall retain the responsibilities for the soils beneath those buildings that are described in this Order until such time as the buildings have been removed and the soils beneath them can be accessed, assessed and remediated as necessary."[7]

DTSC's selection of the final remedies to remediate the contaminated soil and groundwater at the SSFL site is subject to environmental review pursuant to CEQA. DTSC represents it is currently conducting a CEQA review of the proposed soil and groundwater cleanup required under the 2007 Order and the 2010 AOC.

---

[7] The 2010 AOC references *Natural Resources Defense Council, Inc. v. Department of Energy* (N.D.Cal., May 2, 2007, No. C-04-04448 SC) 2007 WL 1302498, at \*22, opn. amended (N.D.Cal., Aug. 15, 2007, No. C-04-04448 SC) 2007 WL 2349288, in which a federal district court concluded DOE has continuously violated the National Environmental Policy Act and permanently enjoined DOE " 'from transferring ownership or possession, or otherwise relinquishing control over, any portion of Area IV until the Department of Energy has completed an [Environmental Impact Statement] [regarding remediation plans at SSFL] and issued a Record of Decision pursuant to NEPA. . . . The Court will retain jurisdiction over this matter until it is satisfied that the DOE has met its legal obligations as they relate to the remediation of Area IV.' " The parties do not discuss the impact of this prior suit on the activities at issue in this case.

*C. DPH*

Respondent DPH regulates radioactive materials in California and issues radioactive material licenses, like the one it issued for SSFL under the Radiation Control Law. (Health & Saf. Code, §§ 114990, 11500, subd. (b), 115060, subd. (a).) The license applies to the SSFL site, subject to conditions on use locations and areas released from the license (including buildings). As a result, various restrictions still attach to the property. (Cal. Code Regs., tit. 17, §§ 30190-30205.) DPH also oversees the disposal of "low-level radioactive waste." (See *id*., § 30470.)

When DPH terminates a license, it does so through a decommissioning process that requires licensees "to remove safely from service and reduce residual radioactivity to a level that permits release of the property for unrestricted use and termination of the license." (Cal. Code Regs., tit. 17, § 30100, subd. (c).) A prerequisite for terminating a license is a determination by DPH that the radioactive material has been properly disposed, reasonable effort has been made to eliminate residual radioactive contamination, and a radiation survey has been performed and demonstrates that the premises are suitable for unrestricted use. (Cal. Code Regs., tit. 17, § 30256, subd. (k).)[8] Removing a building from a license ends DPH's regulation of that building.

DPH also has authority to prohibit the disposal of low-level radioactive wastes in such a manner as would "result in . . . significant radioactive contamination of the environment." (Health & Saf. Code, § 114715; see *id*., § 114720.) Generally, this

---

[8]  California Code of Regulations, title 17, section 30256, subdivision (k) provides: "Specific licenses shall be terminated by written notice to the licensee when the Department determines that: [¶] (1) Radioactive material has been properly disposed; [¶] (2) Reasonable effort has been made to eliminate residual radioactive contamination, if present; and [¶] (3) A radiation survey has been performed which demonstrates that the premises are suitable for release for unrestricted use; or other information submitted by the licensee is sufficient to demonstrate that the premises are suitable for release for unrestricted use."

statutory authority does not apply to material from a decommissioned building because by the time a building is decommissioned, all radioactive waste must have been "properly disposed." (Cal. Code Regs., tit. 17, § 30256, subd. (k)(1).)

Disposal of "low-level radioactive waste," defined as "regulated radioactive material" that meets certain technical requirements, is regulated under a separate multi-state compact.[9] (Health & Saf. Code, §§ 115255, art. 2, 115261, subd. (e)(4).) Because there is no longer any "regulated radioactive material" in a decommissioned building, the compact would generally not apply. (Health & Saf. Code, § 115255, art. 2(I).) Under an executive order signed in 2002 by then-Governor Davis, decommissioned materials may not be disposed into municipal solid waste landfills and unclassified waste management units.

### III

*Boeing's Demolition of Buildings in Area IV*

In 2008, Boeing alerted DTSC of its intent to demolish a building at SSFL. DTSC's request to delay the demolition was rejected by Boeing, and the demolition proceeded. DTSC subsequently asked to: inspect buildings at SSFL before demolition; be present during demolition; identify the source and nature of any chemical contamination beneath the buildings as well as to maintain the integrity of the ongoing site investigation and cleanup under the 2007 Order and the HWCL. As part of this process, DTSC contracted with DPH so that DPH could provide expertise on the adequacy of previous radiological surveys and release decisions regarding the decommissioning of six buildings as well as in evaluating soils and building materials

---

[9] Under this compact, California agreed to host a facility for disposal of low-level radioactive waste and DPH was authorized to license that facility. However, this facility has not yet been built.

9

disposition. Between April 8 and June 11, 2013, DPH prepared seven memoranda (contract memoranda) reviewing historical documentation as to the buildings.

In 2009, DTSC asked Boeing to prepare an SOP that would govern its demolition activities at SSFL. DTSC requested the SOP to ensure the corrective action addressed in the 2007 Order would not be compromised by the demolition activities and to establish a review process to identify materials impacted by chemical releases in the area. DTSC made the draft SOP available for public review and comment. In notifying the public, DTSC clarified the SOP did not apply to demolitions in areas where known radiological contaminant releases are documented or suspected (such as Area IV) and demolition in those areas was not planned at that time. In 2010, Boeing issued the SOP regarding all building demolition and debris management at SSFL. The SOP stated that Boeing would give DTSC 30-days' notice and an opportunity to comment on Boeing's plans prior to any demolition to ensure that the demolition would not impact cleanup efforts.

Between 2010 and 2012, Boeing demolished and removed eight structures from Areas I and III. In 2012, Boeing began submitting demolition notifications to DTSC for nonradiological buildings in Area IV, starting with Building 4015. DTSC asked Boeing to amend the SOP to cover specific demolition procedures for buildings in Area IV that were never used for radiological activity. Boeing did so in November of 2012. This was labeled Amendment 1 and explains that "Boeing acknowledges the heightened interest in Area IV operations, and has coordinated with DTSC in planning demolition of Boeing owned buildings in Area IV."

On October 15, 2012, DTSC informed Boeing by letter that it had concluded that the proposed demolition of Building 4015 "should not disturb chemically-impacted soil or other impacted surficial media currently under investigation" and that the proposed actions did not merit a more detailed work plan. DTSC also provided comments on the radiological screening criteria Boeing intended to use for Building 4015. Following DTSC's consultation with DPH and US EPA, DTSC concluded that "radionuclide

10

contaminants are not present above background activity levels at the Building 4015 demolition area or in demolition materials identified for disposal and recycling." DTSC recommended that Boeing screen certain features (e.g., the road base underlying the asphalt) for radiological activity and also sample these materials for chemicals and metals, and it told Boeing that DTSC staff planned to be present for the radiological screening. DTSC posted its review letter on the SSFL Web site. Boeing performed radiological screening on all demolition waste.

In September 2012, Boeing informed DTSC that it planned to demolish its six buildings in Area IV, some of which had been licensed for radiologic uses by either DPH or the federal Nuclear Regulatory Commission. These included Building 4005 (remaining slab only); Building 4009; Building 4011 (low bay); Building 4055; the L-85 site (remaining slab and wall from former Building 4093); and Building 4100. Except for Building 4100,[10] each of these buildings had been decommissioned and released for unrestricted use by the relevant radiological licensing authority decades earlier.

On February 6, 2013, Boeing sent DTSC the first demolition notification package for a former radiological building in Area IV, specifically concerning the removal of some remaining asphalt, several concrete slabs, and a wall from the site of a former radiological building, L-85. The actual buildings that comprised L-85 had been demolished and removed in 1995. DTSC again requested that Boeing revise the SOP, this time to provide specific demolition procedures for former radiological buildings in Area IV, and Boeing did so. In this amendment, labeled Amendment 2, Boeing "acknowledges the heightened interest in released former radiological buildings in Area IV, and has coordinated with DTSC and the California Department of Public Health (CDPH) in planning demolition of these buildings. As a result of that coordination,

---

[10] Building 4100 was decommissioned in July 2013.

11

DTSC has requested that the SOP be amended to specifically address application of the SOP to former radiological buildings Area IV." In Amendment 2, Boeing agreed that "[i]f building material surface activity exceeding federal and state release criteria is observed during the above post-demo survey, demolition will be halted and DTSC, DPH and the Department of Energy (DOE) will be notified. Contaminated structural material would be segregated and managed and disposed of as low level radioactive waste." Amendment 2 specifically applies to the six buildings at issue in this case.

To assist its review of the notification packages for Boeing's former radiological buildings to determine whether any changes should be made, DTSC consulted with DPH and US EPA and asked these agencies to review the historical radiological release survey documents for these structures, created during the decommissioning process. Upon review, DPH concluded there was no evidence to contradict past conclusions made in the decommissioning process and that no further radiological surveys were recommended. DTSC expressed the view that soils would not be affected by building demolitions following recommended procedures, and so it did not intend to bring an enforcement action concerning such demolitions. After consulting with DPH and US EPA, DTSC sent Boeing a letter on May 1, 2013, in response to the notification package for the L-85 site. In its letter, DTSC recommended additional postdemolition radiological screening for some of the material at the L-85 site.[11] Boeing agreed to perform this screening. In May 2013, Boeing removed the asphalt, concrete, and wall at the L-85 site, and DTSC staff were present to observe some of the work. Per agreement, Boeing stockpiled some of the concrete and metal piping onsite for focused radiological surveys. DTSC reviewed

---

[11] This was apparently intended to address a note discovered in the 1987 federal Nuclear Regulatory Commission decommissioning report stating that, during the initial building demolition, a small volume of neutron-activated concrete had been left in place and covered with fresh concrete to complete the decay process.

the screening results, and agreed it was suitable for disposal at a Class I facility. During July and August 2013, Boeing provided notice of its plans to demolish the other former radiological buildings.

## PROCEDURAL BACKGROUND

When this litigation was filed in August 2013, Boeing had submitted requests to demolish four more of its six structures. Plaintiffs contacted respondents and raised concerns about the environmental consequences of demolition and offsite disposal. Plaintiffs filed a petition for writ of mandate asserting claims under CEQA and the Administrative Procedure Act (Gov. Code, § 11340 et seq.) (APA), along with a claim that DPH violated a writ of mandate issued in 2002. Within days, DTSC and Boeing agreed to pause Area IV demolition.

Plaintiffs' CEQA claim in their original petition referred to six SSFL buildings that were the subject of contract memoranda prepared by DPH. Referring to a DTSC letter attaching one of those memoranda, plaintiffs alleged that respondents had "approved" demolition of a building known as "L-85." Plaintiffs later filed an amended petition, adding a claim that DPH improperly decommissioned Building 4100 without complying with CEQA.

As amended, the petition raised five causes of action. First, plaintiffs alleged that respondents failed to consider the cumulative impact on the environment prior to decommissioning and demolishing radioactive buildings and disposing of the debris. They argued this obligation was triggered by Public Resources Code section 21065,[12] which applies to discretionary projects approved by public agencies. Plaintiffs asserted that DTSC exercised control, authority, and discretion over Boeing's demolition and disposal activity and as such, the activity constitutes a project for purposes of CEQA. As

---

[12] Undesignated statutory references are to the Public Resources Code.

13

to DPH, plaintiffs argued that in decommissioning Building 4100, DPH exercised its discretion to release the building for unrestricted use, thereby allowing Boeing to demolish the building without review under CEQA.  Second, plaintiffs alleged respondents violated a peremptory writ of mandate issued in 2002, in which the superior court found respondents violated CEQA and the APA when they adopted numerical standards for the cleanup of, and the termination of licenses for, nuclear sites.  The court prohibited respondents from readopting the criteria under 10 Code of Federal Regulations parts 20.1401-20.1406, or similar provisions, without first complying with CEQA and the APA.  Third, plaintiffs alleged respondents engaged in unlawful underground rulemaking when, in issuing their approvals of Boeing's decommissioning, demolition and disposal activities, respondents relied upon several specifically identified standards of general application, none of which were adopted pursuant to the APA's requirements but were intended to apply generally rather than to a specific case.  As fourth and fifth causes of action, respectively, plaintiffs sought declaratory and injunctive relief.

The superior court rejected all of plaintiffs' claims.[13]  On the CEQA claim against DTSC, the superior court found the dispositive issue was whether Boeing's demolition and disposal of the six decommissioned buildings constituted a "project" (or multiple "projects") under the definition in section 21065, subdivision (c).  The court concluded that such activity was not a project because DTSC did not issue a "lease, permit, license, certificate, or other entitlement for use" granting Boeing legal authorization to take action it could not lawfully take without preapproval.  The court explained that DTSC's

---

[13]  Previously, in December 2013, the superior court granted plaintiffs' motion for a preliminary injunction against DTSC for violating CEQA but denied that relief for all other claims.  Pending a merits ruling, the court enjoined DTSC from approving Boeing's demolition and disposal activities unless DTSC complied with CEQA.  The court also later denied Boeing's motion for summary judgment.  Although the preliminary injunction is no longer in effect, Boeing represents it has voluntarily refrained from implementing its demolition and disposal plans during the pendency of this appeal.

14

acquiescence in Boeing's plans did not constitute an entitlement but rather "efforts to gather information and observe private activities that could impact the SSFL site investigation and cleanup . . . as part of [DTSC's] responsibilities under" state environmental statutes. Similarly, the court rejected plaintiffs' alternative argument that DTSC had improperly segmented Boeing's demolition activities from the CEQA review for the agency's own project regarding soil and groundwater remediation, "find[ing] there is insufficient evidence to establish that Boeing's structure demolition is part of the overall site remediation." The court, moreover, specifically deemed forfeited plaintiffs' argument, raised for the first time in their reply brief, that DTSC itself carried out a project under section 21065, subdivision (a) when it reviewed Boeing's SOP.

The superior court also rejected the CEQA claims against DPH, finding that DPH did not approve a project in either its consulting role or in decommissioning Building 4100. The court concluded that, in DPH's consulting role, the agency "merely reviewed and commented on certain documents provided by Boeing to DSTC," which did not "implicate[]" any " 'entitlement for use.' " The court further concluded that, in decommissioning Building 4100, DPH lacked any authority "to direct the future of building 4100 subsequent to its decommissioning" and thus did not " 'approve[]' " any post-decommissioning demolition by Boeing. Accordingly, DPH did not grant an " 'entitlement for use' " in decommissioning Building 4100.

Finally, the court rejected the APA claim against both agencies. It found that the documents plaintiffs claimed were underground regulations were not regulations at all, because the alleged standards discussed in those documents did not " 'apply a rule generally' " or " 'declare how a certain class of cases will be decided.' " As there was no violation of the APA, there also was no violation by DPH of the 2002 writ of mandate, which similarly restricted the use of such standards.

15

Judgment was entered on January 2, 2019. Plaintiffs timely filed a notice of appeal on January 24, 2019.[14]

## DISCUSSION

### I
### *The "Project," Defined*

Plaintiffs argue because CEQA exists to protect against activity that may impact the environment, and the demolition and disposal of buildings contaminated with both chemicals and radiation has "obvious potential environmental impacts," CEQA must therefore apply to Boeing's demolition and disposal activity at SSFL, and respondents violated the law by failing to comply with its requirements prior to the project approval. Not only is it common sense that CEQA would apply to activity involving dangerously contaminated areas such as SSFL, according to plaintiffs, but the obligations under CEQA were triggered by the nature of the activities undertaken by the parties to prepare for the demolition and disposal of Boeing's buildings. Specifically, as to DTSC plaintiffs argue that the demolition and disposal activities constitute a project for purposes of CEQA with DTSC in two ways because: (1) DTSC exercised authority and control over the demolition and disposal of the buildings, thereby issuing an "entitlement for use" under section 21065, subdivision (c) and (2) in reviewing and approving Amendment 2 to Boeing's SOP, DTSC engaged in an "activity directly undertaken by any public agency," under section 21065, subdivision (a). In addition, plaintiffs argue that because the 2010 AOC encompassed the demolition of Boeing's buildings within Area IV, such activity was a functional component of the overall soil and groundwater remediation plan and the failure of DTSC to include Boeing's demolition activity as part of the overall plan, resulted in DTSC improperly segmenting those activities from the CEQA project it is conducting for its soil and groundwater remediation plan.

---

[14] The matter was assigned to this panel on November 30, 2022.

16

As to DPH, plaintiffs further argue that the act of decommissioning Building 4100, thereby releasing the building for unrestricted use, constitutes a CEQA "project" under section 21065, subdivision (c) because during that process DPH issued an entitlement to Boeing to demolish the building.[15] Plaintiffs also argue that respondents sought to avoid their responsibilities under CEQA by improperly segmenting the licensing portion of the project from the future demolition and disposal plans.

We conclude that under the facts of this case, the activities undertaken to demolish Boeing's buildings are private activities not subject to discretionary approval by a public agency, and thus not subject to CEQA. (§ 21080; CEQA Guidelines, Cal. Code Regs., tit. 14, § 15060, subd. (c)(1).)[16]

A. *Standard of Review*

The appellate court's review of a CEQA case "is the same as the trial court's: [It] reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427.) We independently determine whether the record "demonstrates any legal error" by the agency and deferentially consider whether the record "contains substantial evidence to support [the agency's] factual determinations." (*Ibid*.) "When an agency concludes an activity is exempt based on factual considerations, a court reviews for substantial evidence. If the agency's determination 'involves pure questions of law, we review those questions de novo.'

---

[15] We reject Boeing's claim that plaintiffs' CEQA claim against DPH is time-barred because it was not raised in, or relate back to, the original petition. The original petition and amendment demonstrated that plaintiffs challenged the decisionmaking process regarding demolition and disposal of Boeing's buildings, which reasonably includes the decommissioning process.

[16] Further references to the CEQA Guidelines, pursuant to California Code of Regulations, title 14, section 15000 et seq., are as "Guidelines."

17

[Citation.]" (*Protecting Our Water & Environmental Resources v. County of Stanislaus* (2020) 10 Cal.5th 479, 495.) Whether a public agency has given approval to a project under CEQA is a predominantly legal question that is reviewed de novo on appeal. (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 382.) Similarly, "[w]hether two activities are parts of a single project is a question for our independent review." (*County of Ventura v. City of Moorpark* (2018) 24 Cal.App.5th 377, 385.) As plaintiffs' CEQA claims involve questions of law, we review them de novo.

### B. Background Legal Principles

"CEQA is designed to compel government to make decisions with environmental consequences in mind." (*McCorkle Eastside Neighborhood Group v. City of St. Helena* (2018) 31 Cal.App.5th 80, 89.) It "requires public agencies to undertake an environmental review of proposed projects that require their discretionary approval. (Pub. Resources Code, § 21080, subd. (a).)" (*Tuolumne County Citizens for Responsible Growth, Inc. v. City of Sonora* (2007) 155 Cal.App.4th 1214, 1221 (*Tuolumne County*).) Under CEQA, all local agencies must "prepare, or cause to be prepared by contract, and certify the completion of, an environmental impact report on any project that they intend to carry out or approve which may have a significant effect on the environment." (§ 21151; see § 21080, subd. (d).) This report must be prepared and considered prior to a public agency's approval or disapproval of a project. (§ 21061; see Guidelines, § 15004, subd. (a) ["Before granting any approval of a project subject to CEQA, every lead agency or responsible agency shall consider a final EIR or negative declaration or another document authorized by these guidelines to be used in the place of an EIR or negative declaration"].) If the proposed activity does not qualify as a project, it "is not subject to CEQA" and an environmental review under the statute is not required. (*Muzzy Ranch Co. v. Solano County Airport Land Use Com., supra*, 41 Cal.4th at p. 380; Guidelines, § 15060, subd. (c)(3).)

18

" 'Project' means an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is any of the following:  [¶]  (a) An activity directly undertaken by any public agency.  [¶]  (b) An activity undertaken by a person which is supported, in whole or in part, through contracts, grants, subsidies, loans, or other forms of assistance from one or more public agencies.  [¶]  (c) An activity that involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies." (§ 21065; see Guidelines, § 15378.)  "The term 'project' refers to the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies.  The term 'project' does not mean each separate governmental approval." (Guidelines, § 15378, subd. (c).)  " 'Project' " refers to "the whole of an action" (Guidelines, § 15378, subd. (a)); it " 'is given a broad interpretation in order to maximize protection of the environment.' " (*County of Amador v. City of Plymouth* (2007) 149 Cal.App.4th 1089, 1099, quoting *McQueen v. Board of Directors* (1988) 202 Cal.App.3d 1136, 1143.)

*C. The Scope of the Soil and Groundwater Remediation Project*

The parties agree that the soil and groundwater remediation program is a project subject to CEQA.  This CEQA project includes the chemical soil and groundwater remediation program set forth in the 2007 Order, as well as the chemical and radiological soil remediation program set forth in the 2010 AOC.  The parties disagree whether and how Boeing's demolition-related activity is subject to CEQA.  Plaintiffs contend the 2010 AOC "provides that buildings on-site will be demolished, eventually including Boeing's."  As a result, plaintiffs argue, Boeing's demolition-related activities are encompassed within the 2010 AOC and thus part of the overall soil and groundwater remediation project such that compliance with CEQA was required prior to the demolitions.  Plaintiffs also contend that by treating the demolition of Boeing's buildings in Area IV as an independent activity, respondents improperly segmented the demolition

19

and disposal portion from the remediation project. Respondents disagree, maintaining Boeing's demolition-related activity is separate from the remediation project and, as a private activity, not subject to CEQA review.

We start by determining which acts to include and exclude from the scope of the CEQA project. (*Tuolumne County, supra*, 155 Cal.App.4th at p. 1223.) "Which acts, that is, constitute the 'whole of an action' for purposes of determining the scope of a potential project? (Guidelines, § 15378, subd. (a) [term 'project' encompasses 'whole of an action' affecting environment].)" (*Ibid.*) Segmenting (or piecemealing) happens when "an agency . . . split[s] a project into separate segments to avoid consideration of the cumulative environmental impacts of a project." (*McCann v. City of San Diego* (2021) 70 Cal.App.5th 51, 84.) The California Supreme Court has held "that an EIR must include an analysis of the environmental effects of future expansion or other action if: (1) it is a reasonably foreseeable consequence of the initial project; and (2) the future expansion or action will be significant in that it will likely change the scope or nature of the initial project or its environmental effects." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 396; see also *Banning Ranch Conservancy v. City of Newport Beach* (2012) 211 Cal.App.4th 1209, 1222 (*Banning Ranch*) [acknowledging this is the test for piecemealing].)

There may be improper piecemealing when the purpose of the activity at issue is to be the first step toward future development. (See, e.g., *City of Carmel-by-the-Sea v. Board of Supervisors* (1986) 183 Cal.App.3d 229, 244 [county rezoned land as "a necessary first step to approval of a specific development project"], superseded by statute on other grounds as recognized in *People ex rel. Brown v. Tehama County Bd. of Supervisors* (2007) 149 Cal.App.4th 422, 450; *City of Antioch v. City Council* (1986) 187 Cal.App.3d 1325, 1337 [negative declaration wrongly issued; "the sole reason" city approved road and sewer construction was "to provide a catalyst for further development"].) There may also be improper piecemealing when the activity at issue

20

legally compels or practically presumes completion of another action.  (*Nelson v. County of Kern* (2010) 190 Cal.App.4th 252, 272 [EIR for reclamation plan should have included mining operations that necessitated it]; *San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713, 732 [EIR for residential development should have included sewer expansion that was a "crucial element[]" of development]; *Plan for Arcadia, Inc. v. City Council of Arcadia* (1974) 42 Cal.App.3d 712, 726 [shopping center, parking lot, and adjacent road widening "should be regarded as a single project"].)  However, no piecemealing occurs "when the projects have different proponents, serve different purposes, or can be implemented independently."  (*Banning Ranch, supra*, 211 Cal.App.4th at p. 1223.)

Here, Boeing and DOE have different obligations within the overall soil remediation project, and plaintiffs have not demonstrated any legal obligation Boeing has to demolish its own buildings as part of its remediation efforts.  While the 2010 AOC mandates the demolition of DOE's buildings, Boeing is not a party to the 2010 AOC.  Thus, contrary to plaintiffs' contentions, the 2010 AOC does not legally compel Boeing to perform *any* activity, including demolishing its building(s).  (Cf. *Banning Ranch, supra*, 211 Cal.App.4th at p. 1223 ["there may be improper piecemealing when the reviewed project legally compels or practically presumes completion of another action"].)  Nor is the demolition of Boeing's buildings a necessary first step in the soil and groundwater remediation program.  The record demonstrates that cleanup efforts have been taking place for decades and the remediation program and demolitions were each proceeding independently of one another.  Thus, the activities encompassed within the 2010 AOC and Boeing's demolition and disposal program have different proponents and are independent of each other.

Support for this conclusion is even greater considering the 2007 Order, through which Boeing's obligations regarding the chemical contamination of soil and groundwater are established.  The 2007 Order does not require demolition or disposal of

21

any of Boeing's buildings. In fact, the areas of concern listed in the 2007 Order do not include the buildings at issue here and it imposes no specific obligations on Boeing regarding the buildings involved in this case. Thus, even under the 2007 Order, to which Boeing is a party, Boeing's decision to demolish and dispose of its own buildings constitutes activity independent from the soil remediation project. (See *Communities for a Better Environment v. City of Richmond* (2010) 184 Cal.App.4th 70, 99 [the upgrade of a refinery and construction of pipeline exporting excess hydrogen were "independently justified separate projects with different project proponents"]; *Planning & Conservation League v. Castaic Lake Water Agency* (2009) 180 Cal.App.4th 210, 237 [water transfer had "significant independent or local utility" from a broader water supply agreement, and would be implemented with or without the supply agreement]; *Sierra Club v. West Side Irrigation Dist.* (2005) 128 Cal.App.4th 690, 699 [two water rights assignments to city were "approved by different independent agencies" and "could be implemented independently of each other"]; *Plan for Arcadia, Inc. v. City Council of Arcadia, supra*, 42 Cal.App.3d at p. 724 [shopping center EIR could exclude adjacent road work which the city had "long before" decided would be needed due to the construction of a new freeway].)

Our conclusion does not waiver even when we more broadly consider how closely related the act of Boeing's demolition and disposal of decommissioned buildings is to the overall objective of the soil and groundwater remediation project. "The relationship between the particular act and the remainder of the project is sufficiently close when the proposed physical act is among the 'various steps which taken together obtain an objective.' (Robie et al., Cal. Civil Practice—Environmental Litigation (2005) § 8.7.)" (*Tuolumne County, supra*, 155 Cal.App.4th at p. 1226.) "Some courts have concluded a proposed project is part of a larger project for CEQA purposes if the proposed project is a crucial functional element of the larger project such that, without it, the larger project could not proceed." (*Communities for a Better Environment v. City of Richmond, supra*,

22

184 Cal.App.4th at p. 99.) Put another way, " 'Courts have considered separate activities as one CEQA project and required them to be reviewed together where . . . both activities are integral parts of the same project (*No Oil, Inc. v. City of Los Angeles* (1987) 196 Cal.App.3d 223).' " (*Tuolumne County*, at p. 1229.)

While the 2010 AOC contemplates demolition of DOE-owned buildings, it also contemplates that Boeing *may not* demolish its buildings. The 2010 AOC specifically provides that if Boeing does not move forward on demolishing its building(s), DOE's obligations of soil remediation beneath Boeing's buildings is stayed. On the other hand, DOE's remediation plan, as defined in the 2010 AOC, includes soil remediation of areas *other than* beneath Boeing's buildings. If Boeing never demolishes its buildings, the rest of the soil and groundwater remediation project can continue. Thus, it is clear that the two activities can be implemented independently. While Boeing's demolition and disposal program is *somewhat* related to the soil and groundwater remediation project, we cannot conclude it is so closely related to the overall objective of the project, i.e., clean soil and water, as to constitute a crucial functional element. Nor can we conclude that Boeing's demolition and disposal program is an integral part of the overall soil remediation project.

We find the circumstances in this case are unlike the piecemealing found in *Tuolumne County*, a case upon which plaintiffs rely. There, the city approved the application of a proposed home improvement center project. The city's approval of the site plan submitted for the project was conditioned upon the realignment of an existing road that would allow access to the center. (*Tuolumne County, supra*, 155 Cal.App.4th at pp. 1219-1220.) The road realignment was not included in a mitigated negative declaration prepared for the project, which was adopted by the city. The plaintiffs there argued that the road realignment was part of a single CEQA project and asserted the city violated CEQA by not considering the road realignment in the mitigated negative declaration. In response, the respondents argued the road realignment constituted

23

independent activity. (*Id.* at p. 1221.) Noting that commencement of building operations at the home improvement center was conditioned on the completion of the road realignment, the appellate court concluded the two acts were part of a single CEQA project. "Their independence was brought to an end when the road realignment was added as a condition to the approval of the home improvement center project." (*Id.* at p. 1231.)

Instead, we find this case closer to *Banning Ranch, supra*, 211 Cal.App.4th 1209. In that case, the plaintiffs alleged that a planned residential development adjacent to a planned park with an access road between the park and neighborhood were one CEQA project, subject to one EIR. (*Id.* at p. 1224.) The appellate court disagreed, finding that while the access road was a "baby step" (*id*. at p. 1225) toward, and consistent with, the residential development, the park project was separate from the residential project. The court reasoned that they served different purposes and were independent in that the park could proceed without the new neighborhood. (*Id.* at p. 1226.) Similarly, in the case before us, Boeing's demolition and disposal program might be consistent with the soil and groundwater remediation plans, but they ultimately serve different purposes: one removes a structure and the other cleans the soil and water. The activities are not conditioned on one another; they may independently proceed. DOE is bound to clean up the radiological contamination, but no party can compel Boeing to demolish its own buildings (under the 2007 Order or 2010 AOC) so that DOE can meet its obligations. Accordingly, we conclude that the demolition and disposal of Boeing's buildings is not part of the CEQA project.[17]

---

[17] In light of this conclusion, we need not address respondents' argument that the prohibition against segmentation presumes that each smaller part of the larger project meets the definition of "project" under section 21065.

24

*D. Boeing's Demolition Activities Are Not a "Project" under Section 21065,*

   *subdivision (c).*

Plaintiffs argue when DTSC required Boeing to obtain DTSC's approval for the demolition of buildings in Area IV, those actions constituted "[a]n activity that involves the issuance" of an "entitlement for use" and meets the definition of a "project" under section 21065, subdivision (c). Plaintiffs argue the superior court's finding to the contrary is wholly unsupported by law or logic. We disagree.

*1. Neither DTSC Nor DPH Has Statutory Authority Over Boeing's Demolition Activities.*

Plaintiffs do not assert that Boeing was statutorily obligated to obtain approval from DTSC before demolishing buildings Boeing owns at SSFL. Respondents argue this lack of statutory obligation is paramount: because no statutory authority exists, DTSC or DPH could not and did not issue an official permit, license or other entitlement for use to allow Boeing to demolish Boeing's buildings. DTSC notes that the structures in Area IV were not "permitted" units under the HWCL, which is the statute governing DTSC's oversight of Boeing's chemical cleanup efforts at SSFL, and thus pre-approval by DTSC for any modification of those structures was not required. (See Health & Saf. Code, § 25200.15 [owner or operator of a hazardous waste "may change facility structures or equipment" if they are "not within a permitted unit"].)

Boeing agrees and argues that it did not need a license, permit or entitlement to demolish its own buildings that were not under the regulatory purview of DTSC or DPH. Since, as DTSC noted, none of the six buildings at issue were "permitted units" under the HWCL, and each of them was previously decommissioned by DPH (or a predecessor) and thereby restored to unrestricted use, Boeing was free to do anything with the buildings—including demolish them—at any time.

We agree with respondents that plaintiffs have not shown DTSC or DPH had statutorily vested discretionary authority in determining whether Boeing's demolition

25

activities could take place. (See Guidelines, § 15357 [the key question in determining a project is discretionary is "whether the public agency can use its subjective judgment to decide whether and how to carry out or approve a project"].) With respect to disposal of demolished buildings, neither the HWCL nor the HSAA require a private party to obtain DTSC's preapproval. Rather, a party that generates waste must determine whether the waste is hazardous and dispose of the waste appropriately or be subject to enforcement remedies. (See Cal. Code Regs., tit. 22, § 66262.11.) Moreover, under the statute, the demolished buildings are not low-level radioactive waste that can be disposed of only at certain waste facilities because, once the buildings were decommissioned, they no longer constituted "regulated radioactive material." (Health & Saf. Code, §§ 115255, art. 2(I), 115261, subd. (e)(4).) Accordingly, the only restriction on disposal of the building materials is the 2002 executive order prohibiting the disposal of decommissioned materials into municipal landfills or unclassified waste management units, which is not a restriction placed by DTSC or DPH. We further agree with respondents that the lack of statutory authority providing DTSC or DPH discretion over whether Boeing's demolition activities can take place is critical to the outcome of this case. (See § 21080, subd. (a) [CEQA applies to "discretionary projects proposed to be carried out or approved by public agencies"].)

2. *Cooperation Between Boeing and DTSC Did Not Constitute Agency "Approval" or an Issuance of an "Entitlement for Use."*

Plaintiffs argue that the interaction between Boeing and DTSC went beyond voluntary cooperation. They assert that DTSC's ability to control whether, when, and how Boeing demolished Area IV structures is evidence that DTSC operated *as though it regulated Boeing's demolition activities* and constituted an issuance of an entitlement for use under section 21065, subdivision (c). We disagree.

Private activities are subject to CEQA if they involve government participation, financing, or approval. (§ 21065, subds. (b)-(c).) Activities that involve public agency

26

approval include the issuance by a public agency of a lease, permit, license, certificate or other entitlement for use. (§ 21065, subd. (c); see also *Natural Resources Defense Council, Inc. v. Arcata Nat. Corp.* (1976) 59 Cal.App.3d 959, 966-967.) The Guidelines define the word "approval" for public agency projects as "the decision by a public agency which commits the agency to a definite course of action in regard to a project intended to be carried out by any person." (Guidelines, § 15352, subd. (a).) Approval, within the context of a CEQA project, cannot be equated with an agency's mere interest in, or inclination to support a project. (*Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 136-137.) " 'If having high esteem for a project before preparing an environmental impact report (EIR) nullifies the process, few public projects would withstand judicial scrutiny, since it is inevitable that the agency proposing a project will be favorably disposed toward it.' [Citation.]" (*Ibid*.)

"The problem is to determine when an agency's favoring of and assistance to a project ripens into a 'commit[ment].' " (*Save Tara v. City of West Hollywood, supra*, 45 Cal.4th at p. 130.) To make that determination, "we apply the general principle that before conducting CEQA review, agencies must not 'take any action' that significantly furthers a project 'in a manner that forecloses alternatives or mitigation measures that would ordinarily be part of CEQA review of that public project.' ([Guidelines], § 15004, subd. (b)(2)(B); accord, [*Concerned McCloud Citizens v. McCloud Community Services Dist.* (2007)] 147 Cal.App.4th [181,] 196 [agreement not project approval because, inter alia, it 'did not restrict the District's discretion to consider any and all mitigation measures, including the "no project" alternative']; *Citizens for Responsible Government* [*v. City of Albany* (1997)] 56 Cal.App.4th [1199,] 1221 [development agreement was project approval because it limited city's power 'to consider the full range of alternatives and mitigation measures required by CEQA'].)" (*Id.* at p. 138.) With respect to private projects, "approval occurs upon the earliest commitment to issue or the issuance by the public agency of a discretionary contract, grant, subsidy, loan, or other form of financial

27

assistance, lease, permit, license, certificate, or other entitlement for use of the project." (Guidelines, § 15352, subd. (b).)

According to plaintiffs, the conditions DTSC placed on Boeing's demolition and disposal activity and Boeing's acquiescence to those conditions resulted in DTSC shaping the project in a way that foreclosed measures that would ordinarily be part of a CEQA review, such as in an EIR. Plaintiffs also argue that such behavior demonstrated that Boeing needed respondents' approval to move forward with the demolitions and constituted a commitment to that authority paradigm. In support of plaintiffs' argument, plaintiffs point to a multitude of communications primarily between DTSC and Boeing demonstrating DTSC's purported position of authority over the demolition activities. We agree these communications are riddled with terms such as "review," "approve," "potentially allow" and "required" used by DTSC in the context of Boeing's demolitions. We summarize this evidence with plaintiffs' best examples.

In 2008, when DTSC learned that Boeing had plans to demolish a structure at SSFL, DTSC "required" advance notice for future demolitions. In 2009, when Boeing first proposed demolition near Area IV, DTSC expressed concern about the presence of contamination that might have migrated from Area IV and claimed it was "essential DTSC be advised of any potential demolition activities that may require DTSC oversight and/or approval." DTSC "require[d]" Boeing to prepare SOPs for the demolition, which DTSC staff reviewed and asked Boeing to modify. DTSC explained the SOPs were meant to "assure that building demolition w[ould] not result in the removal and uncontrolled reuse of potentially contaminated debris," and to "ensure that the review, approval, documentation, and the administrative record of proposed building demolitions at a minimum meet federal [RCRA] and state [HWCL] regulatory requirements."

Internally, DTSC staff also shared concerns about demolition activity, including "[p]otentially allowing poorly characterized soils to be transported offsite" and "[p]otentially generating contaminated building or road debris that will be taken offsite in

28

an uncontrolled manner." DTSC told the public it had "required the Boeing Company to submit the SOP document to make sure an evaluation of each structure proposed for demolition occurs. The SOP requires an assessment of each structure for possible chemical and radiologic contamination."

When Boeing first raised the prospect of demolishing structures in Area IV, it told DTSC that its radiological structures would not be further surveyed prior to demolition. DTSC told Boeing, "DTSC cannot concur with pre-demolition activities by Boeing in Area IV that involve the removal or disturbance of any site features." Boeing disagreed the predemolition activities would generate debris that would leave the site. Nevertheless, DTSC requested demolition and predemolition activities be delayed until DTSC completed a review of Area IV, and Boeing agreed to delay. Several months later, DTSC informed Boeing that it could commence "pre-demolition activities" only at nonradiological facilities in Area IV. DTSC also stated that Boeing "should" conduct radiation screening results from predemolition work before material was sent offsite for disposal.

Boeing submitted requests to demolish Area IV nonradiological structures. DTSC "approved" these requests, but Boeing was obligated to conduct additional radiological screening and provide results to DTSC.

Boeing then planned the demolition of the six structures at issue in this case, the former radiological facilities. In December 2012, Boeing was waiting for an "ok to proceed" with predemolition activities in the Area IV former radiological buildings and was told by DTSC that it was "looking to have DPH agree with an 'ok to begin demolition.'" In January 2013, DTSC issued a status update and noted that Boeing began "pre-demolition" work in Area IV radiological facilities "with DTSC concurrence."

In March 2013, Boeing submitted its SOP Amendment 2 to address the former radiological facilities. Boeing subsequently incorporated DTSC's revisions in April

2013. These amendments clearly state that the SOPs were prepared at DTSC's specific request and "approved" by DTSC. Amendment 2 requires the involvement of both DTSC and DPH in reviewing demolition requests, and commits to sending all demolition waste to a Class I hazardous waste landfill.

Pursuant to the amendment, Boeing's request to demolish L-85 was reviewed by both DTSC and DPH, which required Boeing to conduct an additional radiological survey of the debris prior to offsite disposal. Boeing performed this survey and the results were reviewed by DTSC, DPH, and US EPA. In its review letter, DTSC states that it and DPH "concur with Boeing's proposals" for radiological screening of the debris, that additional data would "be reviewed by the agencies prior to clearance of this debris for Class I landfill disposal." After reviewing data from the debris screening, DTSC agreed that the debris could be disposed at a Class I facility.

Plaintiffs argue that DTSC's communications with Boeing show both parties' intent to be constrained by DTSC's authority to provide permission for Boeing's demolition and disposal activities; DTSC's approval constituted the pivotal "go/no-go" determination. Plaintiffs argue the superior court failed to understand DTSC's approval of the demolition and disposal "involves" issuance of an "entitlement for use" under CEQA (§ 21065, subd. (c)) because, as the Supreme Court held in *Friends of Mammoth*, to qualify as a " 'project' " requires "only that . . . the government must have some minimal link with the activity, either by direct proprietary interest or by permitting, regulating, or funding private activity." (*Friends of Mammoth v. Board of Supervisors* (1972) 8 Cal.3d 247, 262-263, disapproved of on other grounds in *Kowis v. Howard* (1992) 3 Cal.4th 888.) Plaintiffs argue that coupling that "minimal link" requirement to our Supreme Court's instruction to interpret the statutory language to afford the fullest possible protection (*Friends of the Sierra Railroad v. Tuolumne Park & Recreation Dist.* (2007) 147 Cal.App.4th 643, 653), DTSC's approval to proceed with demolition and disposal is an "entitlement for use."

30

Respondents acknowledge a link between the demolition-related activity and the government but contend that it is not the appropriate link to trigger CEQA. Respondents argue that the link is not related to whether the demolitions can take place but rather if and when they do, and whether they will interfere with DTSC's CEQA project. DTSC asserts it exercised only its enforcement authority (as opposed to regulatory authority) when it asked Boeing to prepare the revised SOP and the two amendments, reviewed those documents, and reviewed and provided comments on Boeing's demolition packages out of concern for protecting the integrity of the ongoing cleanup efforts regarding the chemically contaminated soil and groundwater. (See Health & Saf. Code, § 58009; Gov. Code, § 11180.) According to respondents, their use of terms such as "approval" and "allow" at most "expressed a view that the demolition and disposal plans would not affect the soil and groundwater remediation." Indeed, Boeing notes, DTSC also often used terms like "request" and "recommend," indicating a lack of definitive authority on the demolition activities.

Boeing faults plaintiffs for failing to cite to any evidence that CEQA has ever applied in the context where, as Boeing argues is the situation here, parties and regulators engage in informal communications to ensure no interference with an existing project. Instead, respondents argue, the Guidelines make clear that private activities are projects under section 21065, subdivision (c) only when preapproval is legally necessary. Because plaintiffs have not established that Boeing's ability to demolish its buildings was contingent on the approval of DTSC, DTSC is not the "pivotal go/no-go approval" for Boeing's private activity in demolishing the buildings. Boeing underscores this contention when it notes that it demolished a building in 2008 over DTSC's objection—without consequences.

We agree with respondents that the Guidelines generally contemplate that when private projects may not proceed without discretionary government approval, CEQA is triggered. (See, e.g., Guidelines, §§ 15002, subd. (b)(3) [stating CEQA applies to

31

governmental action which may involve private activities which require approval from a governmental agency], 15377 [defining " 'private project' " as "a project which will be carried out by a person other than a governmental agency, but the project will need a discretionary approval from one or more governmental agencies" for a contract or financing, or a "lease, permit, license, certificate, or other entitlement for use"], 15351 [defining " '[a]pplicant' " as "a person who proposes to carry out a project which needs a lease, permit, license, certificate, or other entitlement for use or financial assistance from one or more public agencies when that person applies for the governmental approval or assistance"].) We also agree that in some circumstances, when a public agency, in theory, retains legal discretion to reject a proposed project, the public agency may as a practical matter, have committed itself to the project. (*Cedar Fair, L.P. v. City of Santa Clara* (2011) 194 Cal.App.4th 1150, 1164.) We don't find those circumstances present in this case.

In *Save Tara v. City of West Hollywood, supra*, 45 Cal.4th 116, the California Supreme Court clarified that the Guidelines' definition of approval involved a "commit[ment]" by the agency. The Supreme Court stated: "A public entity . . . may, by executing a detailed and definite agreement with the private developer and by lending its political and financial assistance to the project, have as a practical matter committed itself to the project." (*Tara*, at p. 135.) On the other hand, the Supreme Court recognized that "[a]gencies sometimes provide preliminary assistance to persons proposing a development in order that the proposal may be further explored, developed or evaluated." (*Id*. at p. 136.) It reasoned: "Not all such efforts require prior CEQA review. (See, e.g., [Guidelines,] § 15262 [conduct of feasibility or planning studies does not require CEQA review].)" (*Ibid*.) "[B]efore conducting CEQA review, agencies must not 'take any action' that significantly furthers a project 'in a manner that forecloses alternatives or mitigation measures that would ordinarily be part of CEQA review of that public project.' " (*Id*. at p. 138.) "Thus the touchstone is whether the approval process involved

32

allows the government to shape the project in any way which could respond to any of the concerns which might be identified in an environmental impact report. And when is government foreclosed from influencing the shape of the project? Only when a private party can legally compel approval without any changes in the design of its project which might alleviate adverse environmental consequences." (*Friends of Westwood, Inc. v. City of Los Angeles* (1987) 191 Cal.App.3d 259, 267, italics omitted.)

Applying these principles, we cannot conclude that either DTSC or DPH controlled the demolition and disposal activities such that either agency had discretionary authority to command or prevent the demolition or that the agency committed itself to the project in such a way as to effectively preclude any alternatives or mitigation measures CEQA would require, including not going forward with the activity. (See *Friends of Westwood v. City of L.A., supra*, 191 Cal.App.3d at p. 270 [a discretionary project requires the exercise of judgment in approving or disapproving a particular activity, " 'as distinguished from situations where the public agency or body merely has to determine whether there has been conformity with applicable statutes, ordinances, or regulations' "].) DTSC provided neither financial or political support for the demolitions, nor did DTSC confer a vested right to Boeing to demolish its own buildings. (See *Citizens for Responsible Government v. City of Albany, supra*, 56 Cal.App.4th at p. 1215 [a development agreement providing a vested right to complete a project within certain clear and narrowly defined parameters constituted an " 'entitlement for use' " within the meaning of subd. (c) of § 21065].) Rather, DTSC provided guidance and suggestions on how Boeing should implement its autonomous decision to demolish Boeing's buildings, so that the integrity of the existing remediation project would not be compromised. DTSC hired DPH to assist in reviewing data regarding radiological contamination. In these ways, DTSC continued to participate in the remediation programs already underway. Although Boeing could have performed the demolition activity on its own, without any change in its design, it decided to address the concerns of DTSC while doing

33

so. We conclude this activity represents Boeing's cooperation and voluntary agreement to complete certain tasks while undertaking its demolition and disposal activities. Contrary to plaintiffs' contentions, Boeing's cooperation with DTSC in how it conducted the demolition activities did not trigger DTSC's obligations under CEQA. (See *McQueen v. Board of Directors, supra*, 202 Cal.App.3d at p. 1146 ["CEQA requires consideration of the potential environmental effects of the project actually approved by the public agency, not some hypothetical project"], disapproved of on other grounds in *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 570 & fn. 2; *Prentiss v. City of South Pasadena* (1993) 15 Cal.App.4th 85, 86-87 [application for a building permit was a ministerial act; the city failed to show that any statute or ordinance gave it discretion to deny the permit on historical architectural grounds and in misinterpreting its authority, it failed to distinguish between laws designed to encourage voluntary historical preservation by private property owners and zoning laws designed to require historical preservation].)

Additionally, plaintiffs mischaracterize *Stockton Citizens for Sensible Planning v. City of Stockton* (2010) 48 Cal.4th 481, which does not support their argument that DTSC's "*ostensible* authority" (*id.* at p. 506), suffices to transform the agency's communications with Boeing into an "approval" of a project under section 21065, subdivision (c). In that case, the Supreme Court described the underlying situation as "under the ostensible authority of a previously adopted master development plan (MDP) for a large urban tract, the City of Stockton (City), through the director of its Community Development Department (Director), purported to approve, as consistent with the MDP, the construction of a Wal-Mart Supercenter on certain parcels within the tract. City then filed an NOE [notice of exemption] announcing its determination that the approval came within CEQA's exemption for ministerial actions." (*Stockton Citizens*, at p. 488, fn. omitted.) However, the issue for the Supreme Court was not whether the ostensible authority constituted "approval," as is the issue here, but which statute of limitations

34

applied to plaintiffs and their challenge to the approval of the CEQA project. (*Id.* at p. 501.) Thus, the issue in *Stockton* had nothing to do with whether the public entity's communications with a private party constituted approval of a project pursuant to section 21065, subdivision (c).

Plaintiffs' reliance upon *McQueen v. Board of Directors, supra*, 202 Cal.App.3d 1136, is equally misplaced. In that case, the public agency acquired and maintained improved real property, which included storage of hazardous wastes known to exist on the property. The appellate court concluded this land acquisition and maintenance was a project "directly undertaken" by the public agency under section 21065, subdivision (a). (*McQueen*, at pp. 1143, 1147.) Because *McQueen* does not address the "approval" requirement under section 21065, subdivision (c), it does not support plaintiffs' argument. Moreover, plaintiffs overstate the holding in *McQueen* as standing for the proposition that "CEQA . . . holds government officials accountable for how they *manifest* their authority," in support of plaintiffs' argument that even if DTSC did not actually have the authority to preapprove Boeing's building demolitions, DTSC's *air of* authority in working with Boeing was sufficient to bestow an "approval" for CEQA purposes. *McQueen* merely rejected the agency's argument that a governmental agency could avoid consideration of and compliance with hazardous waste regulations until after purchase and pending a final decision on the use of property containing the hazardous waste. (*McQueen*, at p. 1146.)

*County of Amador v. City of Plymouth, supra*, 149 Cal.App.4th 1089 and *RiverWatch v. Olivenhain Municipal Water Dist.* (2009) 170 Cal.App.4th 1186, also provide support for our conclusion, albeit in contrast to the case at bar. In *Amador*, the city entered into an agreement that required it to send a letter supporting a tribe's casino complex, vacate a portion of a road, and remodel a fire station. (*Amador*, at pp. 1104-1109.) The agreement also committed the city to provide water and sewer services to the gaming development and to install related infrastructure. (*Id*. at pp. 1109-1111.) Those

specific commitments by the city constituted CEQA "approval" because the agreement committed the city to taking actions which would have an environmental impact, even though the casino itself required no city approval. (*Id*. at pp. 1099-1100.) The analysis focused on the "causal link" between the city's action and the potential for environmental impact. (*Id*. at p. 1101.) Moreover, the agreement committed the city to a "definite course of action" with respect to specific future actions and activities. (*Id.* at p. 1103.) That causal link and commitment to a definite course of future action are both lacking in the current case.

Similarly, in *RiverWatch v. Olivenhain Municipal Water Dist., supra*, 170 Cal.App.4th 1186, the water district entered into a contract committing it to sell and transfer water for use at a landfill. (*Id.* at pp. 1196, 1212.) Further, the contract "set forth the specific details regarding [the district's] 60-year obligation to deliver recycled water . . . and the construction required to allow that delivery." (*Id.* at p. 1212.) The appellate court concluded that the district's agreement was an "approval" under CEQA because it committed itself to a definite course of action regarding its part in the project. (*Ibid*.)

Here, in contrast, DTSC's purported approval did not commit DTSC to any action not already inherent in its regulatory authority over the soil remediation project (i.e., ensuring humans were protected from contaminated soils). Even if certain activities, such as DTSC's presence at the demolitions or the review of additional radiological screening surveys, are considered new tasks for DTSC, we cannot conclude that DTSC's desire to monitor the demolition activities created a potential for environmental impact.

*Parchester Village Neighborhood Council v. City of Richmond* (2010) 182 Cal.App.4th 305 supports our conclusion. In *Parchester*, a Native American tribe sought to recover its tribal lands and build a casino on them. (*Id*. at p. 308.) The appellate court held that "the Tribe's casino development does not constitute a 'project' of the City under CEQA because the City has no legal authority over the property upon which the casino will be situated." (*Id*. at p. 313.) Although the city's "agree[ment] to

36

support the Tribe's efforts" may well have had " 'substantial influence' over the federal government's decision" regarding the acquisition of lands, the decisive factor under CEQA was that, if the city instead had "decide[d] to 'disapprove' of the project, its decision would not be binding." (*Ibid*.) Because the city did not have the authority to issue the " 'pivotal go/no-go approval of this project,' " "its refusal to support the Tribe could" not "have prevented the casino from being constructed," and so the casino was not the city's project. (*Id*. at p. 314.) So too here. While DTSC may have had substantial influence over how Boeing carried out its demolition activities, DTSC does not have the power to grant "go/no-go approval" of Boeing's demolition and disposal plans. If Boeing had rejected DTSC's requests to inspect Boeing's buildings prior to demolition, to monitor demolition, or to amend their SOPs, DTSC was powerless to act, and it could not have prevented Boeing from going forward with its demolition and disposal activities. Thus, there was no discretionary authority DTSC had over Boeing's program.

*E. DTSC's Review of Boeing's SOPs Did Not Constitute Direct Activity Under Section 21065, subdivision (a).*

Plaintiffs argue that DTSC directly undertook an activity that could result in a physical change in the environment when it approved Amendment 2 to the SOPs, establishing conditions under which Boeing could demolish its buildings, thereby constituting a CEQA project under section 21065, subdivision (a). In the writ proceeding below, the trial court found the issue forfeited because "points raised in a reply brief for the first time will not be considered unless good cause is shown for the failure to present them before." (*Balboa Ins. Co. v. Aguirre* (1983) 149 Cal.App.3d 1002, 1010.) Respondents argue this issue remains forfeited by plaintiffs' failure to include this issue in their opening brief below and, in the alternative, has no merit.

We exercise our discretion to reach the issue. "[T]he fact that a party may forfeit a right to present a claim of error to the appellate court if he or she did not raise the issue in the trial court does not mean the appellate court is deprived of authority to reach the

37

merits of the issue." (*People v. Young* (2017) 17 Cal.App.5th 451, 463; see *People v. McCullough* (2013) 56 Cal.4th 589, 593 ["neither forfeiture nor application of the forfeiture rule is automatic," and "[c]ompeting concerns . . . may also cause an appellate court to refrain from applying the forfeiture bar"].)

Plaintiffs argue that DTSC's approval of Amendment 2 constituted a project under section 21065, subdivision (a) because the SOP was a regulatory document governing the demolition activities, including the determination that "[a]ll demolition waste, including the contents of buildings removed during pre-demolition preparations, will be disposed of to a Class 1 hazardous waste landfill." However, the cases cited by plaintiffs do not appear to support their argument that DTSC's approval of the SOPs and Amendment 2 constituted "direct activity" under subdivision (a). (See, e.g., *John R. Lawson Rock & Oil, Inc. v. State Air Resources Bd.* (2018) 20 Cal.App.5th 77, 99 [modification of current regulations qualifies as "approval" of the modified regulations under CEQA, but does not address whether it constitutes direct activity]; *California Unions for Reliable Energy v. Mojave Desert Air Quality Management Dist.* (2009) 178 Cal.App.4th 1225, 1240-1242 [the agency admitted its adoption of a rule was a "project" under CEQA; the issue was whether it was exempt from CEQA review].)

In addition, contrary to plaintiffs' claim, the SOPs and in particular Amendment 2, do not constitute a regulatory document. Rather, Amendment 2 is a document drafted by Boeing and, while DTSC requested the amendment, and made suggestions regarding its contents, it is not a regulation. In contrast, the examples of direct agency activities provided by the Guidelines include "public works construction and related activities clearing or grading of land, improvements to existing public structures, enactment and amendment of zoning ordinances, and the adoption and amendment of local General Plans or elements thereof pursuant to Government Code Sections 65100-65700." (Guidelines, § 15378, subdivision (a); cf. *POET, LLC v. State Air Resources Bd.* (2017) 12 Cal.App.5th 52, 73-74 [it was undisputed that a state agency's enactment of

38

regulations constituted a CEQA project; the question was defining the scope of the project]; *Plastic Pipe & Fittings Assn. v. California Building Standards Com.* (2004) 124 Cal.App.4th 1390, 1412-1413 [concluding a regulation excluding a certain type of pipe based on public health concerns was a discretionary CEQA project]; see also Guidelines, § 15378, subd. (a)(1).) Encouraging and ultimately agreeing to Boeing's additional procedures as outlined in Amendment 2, is not the equivalent to creating ordinances or amending local general plans.

We also agree with respondents that, contrary to plaintiffs' claims, any concurrence by DTSC regarding the removal of demolition debris to a Class I disposal facility does not constitute direct agency activity. First, the decommissioning process indicated that residual radioactivity had been removed, and any debris from a decommissioned building was no longer regulated. (Cal. Code Regs., tit. 17, § 30100, subd. (c).) Moreover, DTSC's concurrence to remove demolition debris to a Class I facility simply reflects the policy established in the 2002 executive order governing the disposal of materials from decommissioned facilities released for unrestricted use.

Finally, even if we were to assume DTSC's review of Amendment 2 constituted direct activity under subdivision (a), to be considered a "project" under section 21065, an activity still must meet the key requirement that it may cause "either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment." (§ 21065.) Here, the review of Amendment 2 does not cause a direct or reasonably foreseeable indirect physical change to the environment because it does not mandate the demolition and disposal activities actually take place. Nor did the SOPs cause a reasonably foreseeable indirect change to the environment because the SOPs did not mandate the demolition. (Cf. *Union of Medical Marijuana Patients, Inc. v. City of San Diego* (2019) 7 Cal.5th 1171 [ordinance allowing marijuana dispensary in the city was a CEQA project because it could result in reasonably foreseeable changes in the environment through new construction to accommodate new retail businesses].) Here,

39

the review considers only additional measures to protect the soil remediation program already underway. It does not create new obligations for DTSC's existing CEQA project. In the absence of any such showing, plaintiffs' subdivision (a) argument fails.

*F. DPH's Act of Decommissioning the Buildings Did Not Constitute a "Project" for CEQA Purposes.*

Plaintiffs argue that when DPH decommissioned Building 4100, with knowledge of Boeing's intent to demolish it, DPH provided Boeing with an entitlement to do so. DPH maintains that plaintiffs misconstrue the nature of the judgment exercised by DPH in the decommissioning process. DPH's position is that the "only judgment DPH exercised was that authorized by section 30256, subdivision (k) [decommissioning buildings]: evaluating whether Boeing had properly disposed of radioactive material and made a reasonable effort to eliminate residual radioactive contamination, and whether Building 4100 was 'suitable for release for unrestricted use.' " Under the law, if the licensee has met the conditions of California Code of Regulations, title 17, section 30256, DPH "shall" terminate the license. (Cal. Code Regs., tit. 17, § 30256, subd. (k).) There are no provisions allowing DPH to consider whether the premises are suitable for a specific use including demolition; the question is whether the premises are suitable for *unrestricted* use. Nor is decommissioning an "approval" of any disposition of the property because the process is not dependent on any particular intended use of the decommissioned premises. (Guidelines, § 15352.) According to DPH, it would be impossible for it to issue an entitlement for use through the decommissioning process because when it terminated the license for Building 4100 as a location for Boeing's possession or use of a radioactive material, any restrictions placed on the building's use through the licensing process were *removed*, not imposed. DPH has the better argument.

Boeing's plans for the building were not a permissible consideration in deciding whether the building could be decommissioned. Nor was a planned demolition a condition precedent to decommissioning. Any reference to demolition in the license

40

amendment was simply an acknowledgement that the building was suited for *any* use, which in this case happened to be a planned demolition. Under these circumstances, DPH did not issue an "entitlement for use" specifically permitting Boeing to demolish the buildings when it decommissioned Building 4100. Contrary to plaintiffs' claims, this does not result in "turning a blind eye to the effects of demolition and disposal of radiological material." The decommissioning process means that, as a matter of law, any radioactive material has been properly disposed, reasonable effort has been made to eliminate residual radioactive contamination, and a radiation survey has been performed and demonstrates that the premises are suitable for unrestricted use. (Cal. Code Regs., tit. 17, § 30256, subd. (k).) To the extent plaintiffs challenge the adequacy of the decommissioning process, those claims should have been raised long ago.

Finally, we reject plaintiffs' related argument that DPH improperly segmented its licensing responsibilities from future demolition and disposal activities. While an agency must consider the "whole of an action" (Guidelines, § 15378, subd. (a)), we have already determined that neither the demolition activity nor the decommissioning process constitutes a project for CEQA purposes. In light of this and, given the lack of contractual connection between the decommissioning process and the demolition, the parties did not improperly segment the two independent activities in violation of CEQA. (See *City of Santee v. County of San Diego* (2010) 186 Cal.App.4th 55, 67-68.)

II

*Underground Regulations*

Plaintiffs argue DTSC and DPH have ignored the existing rule allowing for decommissioning of a radiological facility after "[r]easonable effort has been made to *eliminate* residual radioactive contamination, if present" (Cal. Code Regs., tit. 17 § 30256, subd. (k)(2), italics added) and instead have followed "more permissive" numeric cleanup standards for radioactive materials. Plaintiffs assert that DTSC and DPH have been doing this for decades, prompting a lawsuit in 2002. In the previous

41

lawsuit, the superior court ordered DPH to not adopt the radiological criteria for license termination pursuant to 10 Code of Federal Regulations parts 20.1401-20.1406, which employs numeric cleanup standards for radioactive materials, without first complying with CEQA or the APA. Plaintiffs contend that DTSC and DPH continue to violate that prior ruling as well as the APA by relying on four "underground regulations" to approve demolition and disposal of radiological structures.

Both DTSC and Boeing assert that plaintiffs forfeited this argument as it relates to the decommissioning process. DTSC notes that in the superior court, plaintiffs defined the class to which the underground regulations purportedly applied as: "[T]he demolition of radiologically contaminated structures, and disposal of the resulting waste." Plaintiffs respond that this claim is not forfeited; the nature of their claims always included the decommissioning process as well as the demolition and disposal activities. We conclude the claim is not forfeited. Plaintiffs amended their petition to include the decommissioning process as part of their claim respondents engaged in underground rulemaking. Plaintiffs also included this argument in their superior court briefs.

A. *The Four Documents Are Not Underground Regulations Under* Tidewater.

A "regulation" is defined as a rule, order or standard of general application adopted by a state agency to implement, interpret or make specific the law it enforces or administers, or to govern its procedures. (Gov. Code, § 11342.600; *Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 571 (*Tidewater*).) Generally, state agencies must adopt regulations following the procedures established in the APA. These procedures, among other things, require state agencies to provide the public with notice of proposed regulations (Gov. Code, §§ 11346.4, 11346.5), give interested parties an opportunity to comment on proposed regulations (*id.*, § 11346.8), and respond in writing to submitted written comments (*id.*, §§ 11346.8, 11346.9). Regulations wrongly adopted outside these procedures are known as "underground regulations" and are void. (See Cal. Code Regs., tit. 1, § 250, subd. (a); *Tidewater*, at pp. 572-573.)

"A regulation subject to the APA thus has two principal identifying characteristics. [Citation.]  First, the agency must intend its rule to apply generally, rather than in a specific case.  The rule need not, however, apply universally; a rule applies generally so long as it declares how a certain class of cases will be decided.  [Citation.]  Second, the rule must 'implement, interpret, or make specific the law enforced or administered by [the agency], or . . . govern [the agency's] procedure.' " (*Tidewater, supra*, 14 Cal.4th at p. 571.)  But not all agency interpretations are regulations.  For instance, "interpretations that arise in the course of case-specific adjudication are not regulations, though they may be persuasive as precedents in similar subsequent cases." (*Ibid*.; see also *Alvarado v. Dart Container Corp. of California* (2018) 4 Cal.5th 542, 555 [interpretations "announced in the context of resolving a specific case" are not regulations under the APA].)

"The case law does not precisely define the complete standard of review when the underlying question is whether the administrative agency promulgated and relied upon an underground regulation." (*Malaga County Water Dist. v. Central Valley Regional Water Quality Control Bd.* (2020) 58 Cal.App.5th 418, 435.)  *Tidewater* suggests that whether a public agency has engaged in underground rulemaking in violation of the APA is reviewed de novo as to questions of law.  (See *Tidewater, supra*, 14 Cal.4th at p. 572 [independently reviewing the record and determining, as a matter of law, that the disputed policy was an underground regulation].)  However, as *Tidewater* notes, one of the two factors for determining whether an underground regulation exists is whether the agency intends its policy or document apply to cases generally, which may require factual determinations.  (See *id.* at p. 571.)  The parties agree there are no factual disputes and that a de novo standard of review applies.  We agree.  (See *Malaga*, at pp. 435-436 [de novo review is appropriate where there is no indication of a factual dispute that would trigger any additional standards of review].)

Plaintiffs contend DTSC and DPH are using four "guidance documents" as underground regulations that governed their approval of Boeing's decommissioning, demolition and disposal activities: (1) Regulatory Guide 1.86 published by the federal Atomic Energy Commission regarding termination of operating licenses for nuclear reactors. This regulatory guide contains a table identifying "acceptable" radiation levels for decommissioned facilities; (2) A document promulgated by DOE, identified as DOE Order 5400.5, regarding radiation standards for the protection of the public and the environment; (3) Guidelines promulgated by DPH for "Decontamination of Facilities and Equipment Prior to Release for Unrestricted Use." These guidelines are referred to by the parties as DECON-1; and (4) A 1991 DPH policy memorandum identified as IPM-88-2 outlining procedures to verify facilities where radioactive materials were used have been decontaminated to acceptable levels prior to release for "uncontrolled use." Specifically, plaintiffs argue that DPH improperly adopted these guidelines during the decommissioning process and that DTSC relied on those documents (as they provided the standards for "unrestricted use") in DTSC's demolition and disposal decisions.

It is undisputed neither DTSC nor DPH adopted these documents pursuant to the APA. DTSC and DPH argue, however, these documents are not regulations within the meaning of the APA. We agree.

First, even if DECON-1 and IPM-88-2 once met the definition of a regulation, it appears they have not been DPH policy since at least 2002. The other two documents announce rules promulgated by two federal agencies, not rules of DTSC or DPH, and DOE Order 5400.5 was canceled by DOE in 2011. Moreover, it was Boeing that voluntarily proposed the release criteria for decommissioning, demolition and disposal, not DPH or DTSC.

DPH argues that Boeing's proposed criteria was an appropriate way to achieve the governing standard for decommissioning under California Code of Regulations, title 17, section 30256. In a large-scale decommissioning, like that involving SSFL, the licensee

44

submits a decommissioning plan including proposed release criteria as a benchmark for decontamination efforts, a final radiation survey and a request for license termination. (See Cal. Code Regs., tit. 17, § 30256, subds. (d), (f), (g), (h) [decommissioning plans to be submitted by licensees and approved by DPH].)  Different licensees propose different criteria and will not necessarily match the limits in the four documents at issue.  DPH is free to reject the proposed release criteria.  DPH evaluates every proposed decommissioning plan to determine whether the licensee has met the conditions of section 30256, subdivision (k) by making a "[r]easonable effort . . . to eliminate residual radioactive contamination."  (Cal. Code Regs., tit. 17, § 30256, subd. (k)(2).)  Indeed, DPH evaluates each such decommissioning on a case-by-case basis, without requiring or adhering to the four documents or any criteria outside of section 30256.  (Cf. *Clovis Unified School Dist. v. Chiang* (2010) 188 Cal.App.4th 794, 803 [rule was intended to apply generally where staff lacked " 'discretion to judge on a case[-]by[-]case basis whether to apply the rule' "].)  In fact, it appears Boeing sought to use criteria more restrictive than the federal standards when it chose to remediate exposure levels comparable to background levels.  Due to the individualized approach and release criteria considered in each potential decommissioning, it cannot be said that these four documents are uniformly used.

Moreover, it is well-established that procedures governing one specific company's activity are not rules of general application.  (*Tidewater, supra*, 14 Cal.4lh at p. 571 [to be a regulation, the agency must intend its rule to apply generally, rather than in a specific case]; *Faulkner v. California Toll Bridge Authority* (1953) 40 Cal. 2d 317, 323-324 [resolution regarding construction of one particular bridge not a regulation because not rule of general application]; *Roth v. Department of Veteran Affairs* (1980) 110 Cal.App.3d 622, 630 [although rule of general application need not pertain universally, it must pertain to all members of a particular class].)  Here, none of the documents "declare[] how a certain class of cases will be decided."  (*Tidewater*, at

p. 571.)  They do not "function[], in both intent and practice, as a rule that must be followed prospectively" in agency proceedings.  (*Alvarado v. Dart Container Corp. of California, supra*, 4 Cal.5th at p. 556.)  Indeed, the documents are not even entirely consistent with one another.[18]

In support of plaintiffs' argument that those standards are universally set, they point to the adoption of one or more of the four documents by General Atomics (relying on DECON-1), as well as University of California, Berkeley, Stanford University and Hunter's Point Naval Station (all relying on Regulatory Guide 1.86).  Yet the record includes evidence of multiple other licensees proposing other criteria.  While we acknowledge that the rule (regarding release criteria) need not be universally applied, the fact that there are so many examples where the criteria were different than those in the four documents, weigh in favor of our conclusion that this is not a general rule, despite examples of cites where the guidance criteria were followed.[19]  Indeed, at Berkeley and Stanford, those licensees proposed using background levels as the standard for cleanup rather than the four documents.  And, at Hunter's Point, the Navy and the US EPA selected the radiological release criteria.

Finally, plaintiffs' reliance on SSFL license amendments, asserting that each of these amendments reference and rely upon one or more of the same four underground

---

[18]  Although DECON-1 and IPM-88-2 include the same surface contamination table, that table is not consistent with DOE Order 5400.5, which "reserve[s]" values for certain nuclides and places one nuclide, I-125, in a different category.  Further, Regulatory Guide 1.86 differs from DOE Order 5400.5 in that it does not "reserve" any categories of nuclides, and it differs from DECON-1 and IPM-88-2 in that it places I-125 in a different category.

[19]  Plaintiffs also argue that the record is "bereft of any evidence or analysis or consideration whether lower radiation levels than those set in the Guidance Documents could practicably be achieved at a given site."  Whether any given site could have "done better" in their efforts to decontaminate that site is beyond the scope of this appeal.

standards, does not persuade us to conclude that the release criteria here were used in any way other than in agreeing to consider them in Boeing's specific situation.

Case law also supports our conclusion. For example, this case is not like *Malaga County Water District v. Central Valley Regional Water Quality Control Board, supra*, 58 Cal.App.5th 418, where the appellate court held that a template hearing procedure, formally "adopted for all cases," was a regulation subject to the APA. (*Malaga*, at pp. 436-437.) Similarly, in *Vasquez v. Department of Pesticide Regulation* (2021) 68 Cal.App.5th 672, a rule applicable to every user of any pesticide product containing a particular ingredient was a regulation. (*Id.* at pp. 687, 689-690.) And in *Californians for Pesticide Reform v. Department of Pesticide Regulation* (2010) 184 Cal.App.4th 887, 907, a pesticide priority list that would "be applied to all pesticides in the state" was a regulation. Here, in contrast, the four documents are not implemented by DPH, do not govern any identifiable class of cases, nor have they been required to be used uniformly in all decommissioning cases. (Cf. *Vasquez*, at p. 690 [" 'a state regulation that is implemented through a private intermediary is still a regulation' "].) Accordingly, we conclude plaintiffs have not proven DPH is applying an underground regulation by way of the four documents.

With respect to DTSC, plaintiffs have not shown that DTSC required compliance with the four documents as a rule to apply generally and did not " 'implement, interpret, or make specific the law enforced or administered by [the agency], or . . . govern [the agency's] procedure.' " (*Tidewater, supra*, 14 Cal.4th at p. 571.) First, the radiological release criteria have nothing to do with DTSC's implementation of the HWCL, which governs hazardous waste cleanup for soil and groundwater. (See, e.g., Health & Saf. Code, §§ 115060, subd. (a) [DPH authority to license the possession of radioactive materials], 114715, 114720 [authorizing DPH to "prohibit the disposal of radioactive wastes" in such a manner as would "result in . . . significant radioactive contamination of the environment"].) As noted above, the HWCL authorizes DTSC to compel cleanup

actions of hazardous waste contamination at hazardous waste management facilities such as SSFL. (Health & Saf. Code, § 25200 et seq.; Cal. Code Regs., tit. 22, § 66261.20 et seq.; Health & Saf. Code, § 25187.) However, both thr RCRA and the HWCL specifically exclude from the definition of hazardous waste radioactive materials regulated under the federal Atomic Energy Act. (42 U.S.C. §§ 6903(27), 6905(a); Cal. Code Regs., tit. 22, § 66261.4, subd. (a)(2); see also *U.S. v. Manning* (9th Cir. 2008) 527 F.3d 828, 833, fn. 4 [the RCRA does not explicitly allow states to engage in broad regulation of the radioactive component of mixed waste].) Thus, when DTSC issued its review letter in 2013 stating that the "exposure levels" of the L-85 debris qualified for a Class I facility, DTSC was not enforcing an underground regulation but merely reporting test results. In addition, it was Boeing that voluntarily proposed using these release criteria for decommissioning and thereafter in connection with the demolition and disposal and there is every indication DTSC and DPH could have rejected them. Accordingly, plaintiffs have not demonstrated that DTSC required Boeing's compliance prior to enforcement of, or compliance with, a law within DTSC's jurisdiction.

Plaintiffs also assert that by utilizing the numerical standards for release criteria, DPH impermissibly deviated from the statutory standard of elimination of all radiation that can reasonably be eliminated. In other words, whereas the statutory goal is to achieve the lowest amount of residual radiation prior to decommissioning, licensees can use the four documents as an upper limit such that when providing their own target amount, they simply need not go above the criteria in the document(s). We disagree. Contrary to plaintiffs' claim, even if those four documents were set apart as the standard for the maximum limits, that does not necessarily render them regulations or incompatible with the requirement that licensees make reasonable efforts to eliminate residual radioactive contamination. (Cal. Code. Regs., tit. 17, § 30256, subd. (k).) As previously noted, the process is case-by-case, with many licensees committing to cleanup standards to background levels in an effort to achieve the goal of elimination.

48

As a final note, to the extent plaintiffs are challenging the sufficiency of the decommissioning process for the buildings completed in 2013, plaintiffs' challenge is untimely. (See *Kupka v. Board of Administration* (1981) 122 Cal.App.3d 791, 794 ["Where judicial review of an administrative decision made under the Administrative Procedure Act (Gov. Code, § 11370 et seq.) is sought by writ of mandate, the petition must be filed 'within 30 days after the last day on which reconsideration can be ordered.' (Gov. Code, § 11523)"].) Plaintiffs contend that the chapter of the Government Code in which section 11523 is located concerns decisions in adjudicatory hearings before administrative law judges and has no application here. We disagree. While the chapter is titled: "Administrative Adjudication: Formal Hearing," Government Code section 11501 states, "[t]his chapter applies to any agency as determined by the statutes relating to that agency." (Gov. Code, § 11501, subd. (a).) The APA generally governs adjudicative decisions by DPH (Health & Saf. Code, § 131071). Thus, with certain exceptions not relevant here, a petition for a writ of administrative mandate seeking judicial review of a DPH decision "shall be filed within 30 days after the last day on which reconsideration can be ordered." (Gov. Code, § 11523; see *Saint Francis Memorial Hospital v. State Dept. of Public Health* (2021) 59 Cal.App.5th 965, 975.) In addition, it is beyond the scope of the instant appeal to review the adequacy of the decommissioning process regarding other licensees.

*B. The Release Criteria Did Not Violate the 2002 Writ of Mandate.*

Plaintiffs argue that DPH's use of the four documents is also a violation of the court's order in *Committee to Bridge the Gap v. Bonta* (Super. Ct. Sac. County, No. 01CS01445) stating that DPH cannot adopt regulations under 10 Code of Federal Regulation parts 20.1401-20.1406, which essentially establishes numeric cleanup standards for radioactive materials, without first complying with CEQA and the APA. As we have already concluded DPH is not violating the APA and is not using the four documents as an underground regulation, this argument also fails.

49

## DISPOSITION

The judgment is affirmed.  The parties shall bear their own costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(5).)  The stay of the Department of Toxic Substances Control's approval of any demolition and disposal activities related to the Area IV buildings, issued by this court on February 28, 2019, is vacated upon issuance of the remittitur.

                                                         /s/
                                                   EARL, J.

We concur:

     /s/
DUARTE, Acting P. J.

     /s/
MESIWALA, J.